FILED
United States Court of Appeals
Tenth Circuit

July 8, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

SUREFOOT LC,

  Plaintiff-Appellant,

v.

SURE FOOT CORPORATION,

  Defendant-Appellee.

No. 06-4294

---

Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:06-CV-554-TS)

---

Robert W. Adams of Nixon & Vanderhye P.C., Arlington, Virginia (Steven Call and Carolynn Clark of Ray, Quinney & Nebeker P.C., Salt Lake City, Utah, and Michael E. Crawford, Nixon & Vanderhye P.C., Arlington, Virginia, with him on the briefs), for Plaintiff-Appellant.

Charles W. Jirauch of Quarles & Brady Streich Lang, LLP, Phoenix, Arizona (W. LaNelle Owens of Quarles & Brady Streich Lang, LLP, Phoenix, Arizona; Marcy G. Glenn of Holland & Hart LLP, Denver, Colorado; and Brett L. Foster, Cecilia M. Romero, and Romaine C. Marshall of Holland & Hart LLP, Salt Lake City, Utah, with him on the brief), for Defendant-Appellee.

---

Before **MURPHY, HARTZ,** and **GORSUCH**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

In this case, two companies with similar names find themselves in the midst of a trademark dispute. Over the course of several years, Sure Foot Corp. has repeatedly accused Surefoot LC, of infringing on its trademark, occasionally threatened litigation if Surefoot LC failed to change its name, and filed five administrative petitions opposing Surefoot LC's attempts to obtain trademark registrations. Faced with uncertainty about its right to use the "Surefoot" mark, Surefoot LC filed a declaratory judgment suit against Sure Foot Corp., asking the district court to determine once and for all whether it was infringing on Sure Foot Corp.'s rights. Applying our then-governing precedent, the district court dismissed the suit for failing to present a justiciable case or controversy under Article III because it found Surefoot LC had no reasonable apprehension of an imminent lawsuit from Sure Foot Corp. After the district court issued its judgment, however, the Supreme Court, in *MedImmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764 (2007), expressly rejected the "reasonable apprehension of imminent suit" test on the ground that it imposed an additional hurdle inconsistent with the Court's Article III jurisprudence. This appeal calls upon us to assess and apply *MedImmune*'s teachings for the first time. In doing so, we conclude that a triable case or controversy within the meaning of Article III exists; accordingly, we are obliged to reverse and remand this matter to the district court for further proceedings.

I

The parties are in the foot business. Sure Foot Corp. ("Sure Foot ND"), based in North Dakota, manufactures and sells shoe traction products as well as shoe laces and insoles; it has sold products under the "Sure Foot" brand since at least 1985, when it registered a trademark for the use of "Sure Foot" in connection with non-skid shoe pads. Meanwhile, Surefoot LC ("Surefoot UT"), based in Utah, began business in 1994 and manufactures and sells custom-fit ski boots and ski boot orthotics.

By 1998, Sure Foot ND became aware of Surefoot UT's use of the "Surefoot" mark. Believing that this use infringed on its trademark rights, Sure Foot ND sent to Surefoot UT a cease and desist letter asserting that Surefoot UT's use of the "Surefoot" mark "infringe[d] on Sure Foot's rights in the SUREFOOT trademark, and create[d] a likelihood of confusion" between the companies and their products. App. at 76. It concluded by demanding that Surefoot UT cease using the "Surefoot" mark. *Id.*

Over the next year, Sure Foot ND and Surefoot UT corresponded in an attempt to settle their dispute. Surefoot UT insisted that its "Surefoot" brand of ski boot products was sufficiently distinct from Sure Foot ND's product line so that there was no likelihood of consumer confusion. Accordingly, Surefoot UT refused to change its name, though it did express some willingness to consider a monetary settlement. For its part, Sure Foot ND continued to assert that

- 3 -

confusion between the two marks was likely and was already occurring in the market. It expressed a desire to resolve the matter outside of court, but on more than one occasion threatened litigation if no settlement could be reached. *See, e.g.*, App. at 82-83 (July 20, 1999 letter) ("Sure Foot feels it has no option but to seek legal redress. . . . Sure Foot continues to believe that litigation is in neither party's best interest. Nevertheless, it cannot accept your absolute refusal to change your name. Absent your agreement to do so, Sure Foot will pursue other more formal avenues of relief available to it."). The parties failed to reach a settlement, and, by the end of 1999, communications between the parties essentially ceased.

In September 2000, Surefoot UT applied to the U.S. Patent and Trademark Office ("USPTO") to register the "Surefoot" mark in connection with certain of its products. The USPTO issued a Notice of Publication for this trademark application on June 19, 2001. No opposition was ever filed by Sure Foot ND or any other party, and the USPTO ultimately issued a trademark registration to Surefoot UT on June 25, 2002. Shortly thereafter, on August 1, 2002, Sure Foot ND filed a petition with the USPTO's Trademark Trial and Appeal Board ("TTAB"), the administrative body charged with adjudicating trademark registration disputes, seeking to cancel Surefoot UT's trademark. At the same time, Sure Foot ND filed an opposition to another trademark application by Surefoot UT that was then pending. During a one-year period from mid-2005 to

mid-2006, Surefoot UT applied for three more trademark registrations for other products and services using the "Surefoot" mark, and Sure Foot ND filed oppositions with the TTAB to each of these applications. The parties eventually agreed to consolidate their various disputes in the TTAB into one proceeding, which appears to be pending currently.

Believing that Sure Foot ND would not only continue to oppose future trademark applications but would also eventually sue for trademark infringement, Surefoot UT filed a declaratory judgment action in federal district court in July 2006. In its complaint, Surefoot UT sought a declaratory judgment that (1) Surefoot UT's use of the "Surefoot" mark does not infringe on any of Sure Foot ND's trademark rights; (2) the trademark rights asserted by Sure Foot ND against Surefoot UT are invalid or limited in scope; and (3) any possible trademark infringement, unfair competition, or dilution claims by Sure Foot ND are barred by equitable doctrines. Sure Foot ND moved to dismiss the complaint, arguing, among other things, that no jurisdiction existed under the Declaratory Judgment Act. The district court agreed and dismissed the suit. Specifically, the district court held that, to establish jurisdiction under the Declaratory Judgment Act, Surefoot UT had to, but could not, show that it had a reasonable apprehension of an imminent suit by Sure Foot ND. More specifically, the district court held that, although Sure Foot ND made claims of infringement and threats of litigation during the 1998-99 period that may well have given rise to a reasonable

apprehension of litigation at the time, any such apprehension dissipated by 2006. Neither, the court held, did Sure Foot ND's intervening administrative actions before the TTAB give rise to any reasonable basis on Surefoot UT's part to fear imminent litigation. Surefoot UT now appeals the dismissal of its suit.

## II

The parties' disagreement in this case extends to the standard of review we must apply. Surefoot UT contends that the district court's dismissal of the case for lack of jurisdiction under the Declaratory Judgment Act should be reviewed *de novo*, while Sure Foot ND asserts our review may only be for abuse of discretion. To be fair, neither party is exactly incorrect.

The Declaratory Judgment Act states in pertinent part that, "[i]n a case of actual controversy within its jurisdiction . . . , any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). We have previously observed that this text presents two separate hurdles for parties seeking a declaratory judgment to overcome. *See Kunkel v. Cont'l Cas. Co.*, 866 F.2d 1269, 1273 (10th Cir. 1989). First, a declaratory judgment plaintiff must present the court with a suit based on an "actual controversy," a requirement the Supreme Court has repeatedly equated to the Constitution's case-or-controversy requirement. *See, e.g.*, *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239-40 (1937) ("The

- 6 -

Declaratory Judgment Act of 1934, in its limitation to 'cases of actual controversy,' manifestly has regard to the constitutional provision and is operative only in respect to controversies which are such in the constitutional sense."); *MedImmune*, 127 S. Ct. at 771 (same); *see also infra* Part III (citing additional authority); U.S. Const. Art. III § 2 ("The judicial Power shall extend to all Cases . . . [and] Controversies . . . ."). Second, even where a constitutionally cognizable controversy exists, the Act stipulates only that district courts "may" – not "must" – make a declaration on the merits of that controversy; accordingly, we have held that district courts are entitled to consider a number of case-specific factors in deciding whether or not to exercise their statutory declaratory judgment authority. *See State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 982-83 (10th Cir. 1994) (White, J.) (stating that "the district court is not obliged to entertain every justiciable claim brought before it" and setting out the factors that a district court should consider); *Public Affairs Assoc., Inc. v. Rickover*, 369 U.S. 111, 112 (1962) ("The Declaratory Judgment Act was an authorization, not a command. It gave the federal courts competence to make a declaration of rights; it did not impose a duty to do so."); *see also infra* Part V.

To the extent that the first question implicates purely legal issues and goes to the courts' subject matter jurisdiction, we review any dismissal on this basis *de*

- 7 -

*novo*;[1] because the second question necessarily involves a discretionary assessment of disparate, often incommensurate, and case-specific concerns, we have indicated that we will review a district court's decisions on that score only for abuse of discretion. *See Kunkel*, 866 F.2d at 1273; *Mhoon*, 31 F.3d at 983. In the case before us, Sure Foot UT challenges the district court's determination that this suit, on the basis of essentially undisputed facts, presented no constitutionally cognizable controversy as a matter of law, and the district court never had occasion to reach the second, discretionary jurisdictional question under the Act. Accordingly, our review proceeds *de novo*.

## III

The district court concluded that it lacked jurisdiction to hear Sure Foot UT's suit based on a determination that the company did not have a reasonable apprehension that an imminent suit for trademark infringement was forthcoming from Sure Foot ND. In doing so, the district court faithfully followed our guidance in *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959 (10th Cir. 1996), where we held that, "[i]n an intellectual property case, an actual controversy exists when," among other things, "the declaratory defendant's conduct has created a reasonable apprehension" of imminent suit. *Id.* at 965. Our holding in *Cardtoons*, in turn, relied on an extensive body of case law –

---

[1] Of course, to the extent that a district court's legal conclusion regarding jurisdiction hinges on factual findings, we review those findings for clear error. *See Mo's Express, LLC v. Sopkin*, 441 F.3d 1229, 1233 (10th Cir. 2006).

developed primarily by the Federal Circuit – in which courts required a reasonable apprehension of suit, or even a reasonable apprehension of imminent suit, before deeming Article III's case-or-controversy test satisfied in declaratory judgment actions involving intellectual property claims. *See, e.g.*, *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 634 (Fed. Cir. 1991); *Indium Corp. v. Semi-Alloys, Inc.*, 781 F.2d 879, 883 (Fed. Cir.1985); *see also Teva Pharm. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1333 (Fed. Cir. 2005).

Since the district court issued its decision, however, the Supreme Court entered the field and rejected the body of Federal Circuit case law on which we relied in *Cardtoons*. In *MedImmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764 (2007), the declaratory plaintiff, MedImmune, was a drug manufacturer that had entered into a patent license agreement with licensor, Genentech. When Genentech asserted that one of MedImmune's drugs was covered by one of Genentech's patents (the application for which was still pending at the time the parties entered into the licensing agreement but which was nonetheless covered by the agreement), MedImmune agreed to pay patent royalties under protest even though it believed that its drug did not infringe on Genentech's patent and that the patent was invalid. While continuing to pay royalties, MedImmune filed a declaratory judgment action against Genentech, seeking a declaration of non-infringement or patent invalidity. The district court and Federal Circuit, citing the reasonable apprehension of imminent litigation test, dismissed the suit for

lack of jurisdiction, explaining that, so long as MedImmune chose to continue

paying royalties, it had no reasonable apprehension that it would be imminently

subjected to suit by Genentech.

The Supreme Court reversed. In doing so, the Court rejected the notion

that MedImmune had to stop paying royalties – risking a breach of contract action

as well as treble damages and attorneys fees for doing so – before seeking relief

through the Declaratory Judgment Act. *See id.* at 775. More generally, the Court

stressed that the Act's "case of actual controversy" language references Article

III's case-or-controversy requirement, *id.* at 771; that a declaratory judgment

"controversy" therefore requires no greater showing than is required for Article

III; and that the existence of a case or controversy in the Supreme Court's

precedents had never depended on one party taking law-breaking or contract-

breaching steps before a declaratory suit could be filed. By way of example, the

Court cited numerous cases in which declaratory plaintiffs were not required to

"expose [themselves] to liability before bringing [declaratory actions]," either to

challenge the basis of laws the government enforced against them or to challenge

the legal basis of threatened action by private parties. *See id.* at 772-73.[2] Most

---

[2] Indeed, one of the cases cited by the Court in this respect came from our court. *See Keener Oil & Gas Co. v. Consolidated Gas Utilities Corp.*, 190 F.2d 985, 989 (10th Cir. 1951) ("[A] party to a contract is not compelled to wait until he has committed an act which the other party asserts will constitute a breach, but may seek relief by declaratory judgment and have the controversy adjudicated in order that he may avoid the risk of damages or other untoward consequence.");

(continued...)

- 10 -

notably, the Court cited *Altvater v. Freeman*, 319 U.S. 359 (1943), in which the Court held a live controversy existed where a patent licensee sought a declaratory judgment of patent invalidity, even though the licensee continued to pay patent royalties (pursuant to an injunction obtained by the patent licensor in an earlier case). Applying the principles of those cases to the suit before it, the Supreme Court held that the district court erred in dismissing MedImmune's case for lack of jurisdiction because, despite the absence of a reasonable apprehension that the declaratory defendant would sue, the case presented a dispute sufficiently definite and live regarding the validity of Genentech's patent to satisfy Article III and invoke subject matter jurisdiction. *See id.* at 777.

Not only did the *MedImmune* Court find a case or controversy in a declaratory suit where no reasonable apprehension of litigation existed, the Court spoke directly to the continuing viability of the reasonable apprehension of suit doctrine developed by the Federal Circuit. In a footnote, the Court stated that the doctrine conflicted with several of the Court's decisions, including *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941), where the Court held that declaratory judgment "jurisdiction obtained even though the collision-victim defendant could not have sued the declaratory-judgment plaintiff-

---

[2](...continued)
*see also Delaney v. Carter Oil. Co.*, 174 F.2d 314, 317 (10th Cir. 1949) ("One of the highest offices of declaratory procedure is to remove uncertainty and insecurity from legal relations, and thus clarify, quiet and stabilize them before irretrievable acts have been undertaken.").

- 11 -

insurer without first obtaining a judgment against the insured," as well as *Aetna*, where the Court held that "jurisdiction obtained even though the very reason the insurer sought declaratory relief was that the insured had given no indication that he would file suit." *MedImmune*, 127 S. Ct. at 774 n.11. And to the extent that the Declaratory Judgment Act's "case of actual controversy" formulation was intended to reference Article III's case-or-controversy requirement, discarding the reasonable apprehension of suit test makes good sense: the existence of an Article III case or controversy has never been decided by a judicial wager on the chances the parties will (imminently or otherwise) sue one another; rather, it has always focused on the underlying facts, assessing whether they suggest an extant controversy between the parties or whether instead they merely call on us to supply an advisory opinion about a hypothetical dispute.

In light of *MedImmune*'s direction, it seems to us clear that the test for declaratory judgment jurisdiction we set forth in *Cardtoons* is no longer good law.[3] To be sure, Sure Foot ND tries valiantly, and in three different ways, to

---

[3] We note that, in addition to the reasonable apprehension of suit test, *Cardtoons* also required declaratory plaintiffs to show that they had "produced or [were] prepared to produce the product in question" in order to establish the existence of a case or controversy. *See Cardtoons*, 95 F.3d at 965. Because that requirement was linked to and closely intertwined with the reasonable apprehension of suit test, we hold that both aspects of the two-part test in *Cardtoons* have now been retired from their status as the touchstones of declaratory judgment jurisdiction in intellectual property cases, though we acknowledge that in some cases they may still prove relevant to determining whether an Article III case or controversy exists under the analysis set out by the
(continued...)

convince us otherwise. First, Sure Foot ND contends that *MedImmune*'s discussion of the reasonable apprehension of imminent suit test is *dicta*, confined to a footnote and inessential to the Court's disposition in the case. We cannot agree. Although the Court held in the body of its opinion that it was bound by the holding of its decision in *Altvater*, in footnote 11 the *MedImmune* Court explained further that, even if *Altvater* could be distinguished on its facts, the point remained that the reasonable apprehension of imminent suit test applied by the Federal Circuit does not comport with *Maryland Casualty* and *Aetna*. Alternative rationales such as this, providing as they do further grounds for the Court's disposition, ordinarily cannot be written off as *dicta*. *See United States v. Rohde*, 159 F.3d 1298, 1302 & n.5 (10th Cir. 1998) ("[The] alternate holding [was] not *dicta*. . . . Were this panel inclined to engage in the business of labeling as dicta one of the two alternative grounds . . . , it would then confront defendant's failure to demonstrate why that label ought not adhere to the alternative which is innocuous to her theory, rather than to the alternative which undermines it."). Moreover, even if the Court's rejection of the reasonable apprehension test could be plausibly characterized as *dicta*, our job as a federal appellate court is to follow the Supreme Court's directions, not pick and choose among them as if ordering from a menu. *See Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir.

_____

³(...continued)
Supreme Court in *MedImmune*.

- 13 -

1996) (we are "bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements") .

Second, Sure Foot ND argues that *MedImmune* at most invalidated only the reasonable apprehension of suit test in patent cases, while *Cardtoons*, like this case, involved a trademark issue. But Sure Foot ND offers no persuasive reason why the interpretation of the Declaratory Judgment Act's terms depends on the nature of the intellectual property right at issue, and nothing in *MedImmune*'s analysis suggests one. Indeed, two of the cases the *MedImmune* Court cited in the process of rejecting the reasonable apprehension of suit test were insurance cases – themselves well outside the intellectual property, much less patent, context. *See MedImmune*, 127 S. Ct. at 774 n.11 (citing *Maryland Cas.*, 312 U.S. at 273 (insurance case), and *Aetna*, 300 U.S. at 239 (same)).[4]

Third, Sure Foot ND argues that *MedImmune* only invalidated the reasonable apprehension of suit test for situations involving parties in a privity

_____

[4] Along similar lines, we note that the two district court cases cited by Sure Foot ND as narrowly construing *MedImmune*'s holding in the way Sure Foot ND proposes did so only because those courts were considering patent cases presumably under the appellate jurisdiction of the Federal Circuit and that Circuit had not yet published a decision overturning its prior decisions in light of *MedImmune*. *See* Appellee's Br. at 39-40 (citing *Prasco, LLC v. Medicis Pharm. Corp.*, 2007 WL 928669 (S.D. Ohio 2007); *WS Packaging Group, Inc. v. Global Commerce Group, LLC*, 2007 WL 205559 (E.D. Wis. 2007)). The Federal Circuit, of course, has now expressly overruled its prior decisions applying the reasonable apprehension of suit test. *See, e.g.*, *Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.*, 482 F.3d 1330, 1336-39 (Fed. Cir. 2007).

- 14 -

relationship, such as through a patent licensing agreement or some other contract. *See* Appellee's Br. at 45-48. But, again, we discern no such limiting principle in the Court's reasoning. The Court rejected the reasonable apprehension of suit test on the basis that Article III is the touchstone of declaratory judgment jurisdictional analysis and that, for a case or controversy to exist under Article III, a party need not "bet the farm" by taking actions that could subject them to substantial liability before obtaining a declaration of their rights. *MedImmune*, 127 S. Ct. at 775. That principle applies equally to privity and non-privity settings. Indeed, the Court cited and relied on numerous cases in which plaintiffs were allowed to pursue declaratory judgments against the government even though the plaintiffs had not taken whatever steps that would have subjected them to criminal or civil prosecution by the government, *see id.* at 772-73, and in none of those cases did a privity relationship exist between the individual and the government.

IV

Having concluded that *MedImmune* displaced the jurisdictional test we announced in *Cardtoons*, the question remains what test replaces it, in light of *MedImmune,* and whether Surefoot UT can meet that test in this case. Our starting point naturally lies in *MedImmune*'s language. There, the Court reminded us of the formulations it offered in *Aetna* and *Maryland Casualty* and suggested they remain key to our jurisdictional inquiry in declaratory judgment actions.

Pursuant to those decisions, a declaratory judgment suit must be "definite and concrete, touching the legal relations of parties having adverse legal interests," must be "'real and substantial' and 'admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *MedImmune*, 127 S. Ct. at 771 (quoting *Aetna*, 300 U.S. at 240-41). Put differently, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (quoting *Maryland Cas.*, 312 U.S. at 273).

As the Court itself admitted, this test, stated in somewhat circular terms in *Maryland Casualty*, does "not draw the brightest of lines between those declaratory judgment actions that satisfy the case-or-controversy requirement and those that do not." *Id.* Still, we can hardly claim unfamiliarity with Article III jurisdictional principles and their application, and reference to the facts and circumstances of the Supreme Court's decisions in the declaratory judgment field suggest that the case before us is a comparatively easy one. In particular, this case avoids the complication at the heart of *MedImmune,* where the existence of a live controversy between the parties seemingly (at least in the eyes of the lower courts) hinged on a future contingency that was entirely within the declaratory plaintiff's control – namely, whether to continue paying royalties. The

*MedImmune* Court solved that complication by explaining that it was Genentech's repeated threat to enforce its claims should MedImmune stop paying royalties that made the continuation of those payments effectively "involuntary [and] coerc[ed]," and thus sufficed to negate the yet-unaccomplished future contingency upon which a live controversy seemed to depend.  127 S. Ct. at 773.

By contrast, and happily, no such unfulfilled future contingency exists in the suit before us.  Surefoot UT asks the federal courts only to adjudicate the rights of the parties based on historical facts and an already existing dispute over a federal right.  Sure Foot ND and Surefoot UT have employed the same (or at least a very similar) mark in connection with their products.  Sure Foot ND has, through various communications with Surefoot UT, made clear its belief that Surefoot UT's use of the "Surefoot" mark already causes confusion in the market and therefore currently infringes on Sure Foot ND's trademark rights.  *See* App. at 76 (Sept. 2, 1998 letter) (stating that the "use of SURE-FOOT infringes on Sure Foot's rights . . . and creates a likelihood of confusion" and that "there were several instances of actual confusion" at a recent trade show); App. at 78 (May 19, 1999 letter) (alleging "actual confusion in the marketplace"); App. at 83 (July 20, 1999 letter) (same).  Sure Foot ND has even threatened to sue for federal trademark infringement if Surefoot UT does not agree to change its name.  *See supra* Part I (citing letter dated July 20, 1999).  And Sure Foot ND has sought to impede Surefoot UT in its use of the "Surefoot" mark by commencing

trademark cancellation and opposition proceedings in the TTAB. On the other side of the suit, Surefoot UT denies that it is infringing on Sure Foot ND's trademark rights and alternatively alleges that Sure Foot ND's trademarks are invalid. Taking "all the circumstances" into account, as we must, *see Maryland Cas.*, 312 U.S. at 273, we cannot help but conclude that the parties before us have a dispute that is definite and concrete that would "'admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *MedImmune*, 127 S. Ct. at 771 (quoting *Aetna*, 300 U.S. at 240-41). Because "[i]t is the nature of the controversy, not the method of its presentation or the particular party who presents it, that is determinative," *Aetna*, 300 U.S. at 244, we can confirm the point by asking, counterfactually, whether we would have Article III jurisdiction if faced with a straightforward infringement suit by Sure Foot ND against Surefoot UT, rather than a declaratory judgment action in which the parties are reversed. Given the evidence before us about the nature of the controversy between the parties in this dispute, we have no doubt the answer would be yes.

In this respect, our case finds a home in the heartland of declaratory judgment cases, closely resembling *Aetna*. In that case, an insured repeatedly claimed coverage under certain insurance policies for a present disability, but never brought suit against the insurer; meanwhile, the insurer, though believing the insured was not entitled to any payment under the policies, felt compelled to

maintain a sum of money in reserve to guard against the contingent liability posed by the insured's claims. *See id.* at 237-39. Seeking to dispel the cloud that the insured's claims placed over the insurer's business affairs, and unwilling to wait until the insured finally (if ever) filed suit, the insurer sought a declaration of the insured's rights in federal court. *See id.* The case presented no complicating issues of future contingencies and the Supreme Court readily held that jurisdiction existed, stressing that the "parties had taken adverse positions with respect to their existing obligations," and the dispute concerned "a present right" based upon historical or "established facts." *See id.* at 242. The very same may be said of the case before us. Indeed, the only perceivable difference between *Aetna* and our case, on the one hand, and conventional litigation, on the other, is the bare formality that the parties are transposed. *See id.* at 244; *Maryland Cas.*, 312 U.S. at 273 ("It is immaterial that . . . , in the declaratory judgment suit, the positions of the parties in the conventional suit are reversed; the inquiry is the same in either case").[5]

---

[5] The case before us also parallels a hypothetical offered by Wright and Miller as a paradigmatic instance where declaratory judgment jurisdiction should be held to exist:

> If Jones Company does not sue [over its claim to a patent], but merely threatens Smith, Smith will have a lively interest in determining whether the patent is valid and whether his device is infringing. Prior to the Declaratory Judgment Act, Smith's action to resolve this question would not, absent diversity, have been within federal jurisdiction. Nevertheless, it now seems settled that Smith can sue for a declaratory

(continued...)

Sure Foot ND objects to the conclusion we reach about the nature of the parties' controversy, arguing that it has not made any claims of infringement or threats of suit since the 1998-99 period, and that the six years separating that period from the filing of this suit dissipated whatever controversy may have existed in the earlier period. But, despite the passage of time, Sure Foot ND has never withdrawn its allegations of ongoing infringement (or its threats to sue). And whether or not the passage of time could effectively eviscerate declaratory judgment jurisdiction where it once existed or how much time is necessary to do so, we need not decide.[6] Even if the parties' controversy dissipated for a period, it was surely rekindled when Sure Foot ND engaged in a new burst of activity beginning in 2002, when it initiated what ultimately became five separate

[5](...continued)
judgment of invalidity or noninfringement. Again, the federal nature of the claim appears on the complaint for a declaratory judgment and the precise issue could have been litigated in federal court in a coercive action brought by Jones Company, although in the suit actually brought by Smith the parties are transposed and the matter may be determined at an earlier stage than if Smith had been required to await a coercive action by Jones Company.

10B Fed. Prac. & Proc. § 2767, at 650-51 (footnotes omitted).

[6] We do note, however, that the Federal Circuit, which appears to have addressed this issue more than any other court, has concluded that the mere passage of time does not eviscerate the existence of an actual controversy unless a declaratory defendant has, for example, made a covenant not to sue the declaratory plaintiff, or where the circumstances of the parties have significantly changed, perhaps such as by the withdrawal of one side's product from the marketplace – neither of which have occurred in this case. *See, e.g.*, *Fina Research, S.A. v. Baroid Ltd.*, 141 F.3d 1479, 1484 (Fed. Cir. 1998).

cancellation and opposition proceedings in the TTAB against Surefoot UT's trademark applications, signaling its belief that Surefoot UT continues to infringe its trademark.

To this, Sure Foot ND replies that TTAB opposition proceedings should be entirely irrelevant when assessing whether an actual controversy exists, and cites to us cases that purportedly support such a conclusion. As it happens, however, most of the cases Sure Foot ND cites stand only for the very modest proposition that, because a party may oppose a trademark registration for reasons having nothing to do with any infringement dispute between the trademark applicant and opponent, courts should not take a TTAB opposition filing, automatically and by itself, to be conclusive evidence of the existence of a live infringement dispute. *See, e.g.*, *Merrick v. Sharp & Dohme*, 185 F.2d 713, 716-17 (7th Cir. 1950).[7] Neither can Sure Foot ND reasonably dispute the fact that TTAB proceedings sometimes do involve express assertions of infringement, and other times are at least a symptom indicative of, or even a proxy fight for, an underlying infringement dispute. Most importantly of all, were we to hold TTAB opposition filings as a class irrelevant to Article III analysis, we would disregard the

---

[7] Certain other cases on which Sure Foot ND relies hold that a TTAB opposition does not give rise to jurisdiction because it fails to create a reasonable apprehension of suit. *See, e.g.*, *Kosmeo Cosmetics Inc. v. Lancome Parfums et Beaute & Cie.*, 44 U.S.P.Q.2d 1472, 1474 (E.D. Tex. 1996) ("An opposition proceeding cannot serve as the basis for reasonable apprehension of suit."). After *MedImmune*, however, we now know that this asks the wrong question.

- 21 -

Supreme Court's direction that, in assessing whether a live controversy exists between the parties, we must both take into account "all the circumstances" before us, *MedImmune*, 127 S. Ct. at 771 (quoting *Maryland Cas.*, 312 U.S. at 273), and be sensitive to the fact that whether jurisdiction exists is often a question of "degree," *Maryland Cas.* 312 U.S. at 273; *see also* 10B Fed. Prac. & Proc. § 2757, at 469 ("Although the massive generalities" of earlier cases are often quoted, "[l]ater cases have recognized, as Justice Murphy did [in *Maryland Casualty*], that whether the controversy is of sufficient immediacy and reality to permit a declaratory judgment is a question of degree.").

Of course, to say TTAB proceedings are not categorically irrelevant does not answer the question what weight they deserve. One might worry, for example, whether the filing of a single TTAB opposition without a hint of an infringement claim should hold much sway in a jurisdictional analysis. One might also be concerned about what assuming jurisdiction in cases where ongoing TTAB proceedings exist might mean as a practical matter; at least one commentator has suggested that the "real policy" undergirding the case law cited by Sure Foot ND for disregarding the existence of TTAB proceedings has nothing to do with Article III but with a more practical concern "not to short-circuit the

administrative tribunal that has already achieved jurisdiction over the issues"

separating the parties. 6 McCarthy on Trademarks 32:52.[8]

In response to these concerns, we underscore that we have no need today to pass on what *MedImmune* means to a case where the only indicia of a live infringement controversy is the existence of a single TTAB opposition proceeding, or perhaps a single cease-and-desist letter, *see supra* note 8. In this case, we have five separate TTAB oppositions combined with an extensive history of interactions between the parties in which the declaratory defendant expressly and repeatedly suggested historical and existing infringing activity by the declaratory plaintiff. It is only this combination that we pass upon today and which we hold suffices to demonstrate the existence of Article III jurisdiction. Neither are we alone in reaching such a conclusion; many other courts before us have considered TTAB oppositions in combination with threats of litigation sufficient under certain circumstances to suggest a live infringement controversy

---

[8] Along related lines, other commentators have expressed the concern that one of *MedImmune*'s effects might be that a single cease-and-desist letter, if not carefully drafted to avoid making threats of litigation, may more frequently give rise to declaratory judgment jurisdiction. *See, e.g.*, Michael Weinstein, The Fate of the Federal Circuit's "Reasonable Apprehension" Standard in Patent Suits for Declaratory Judgment Following *MedImmune, Inc. v. Genentech, Inc.*, 76 U. Cin. L. Rev. 681, 704-06 (2008); *cf.* D. Peter Harvey & Seth I. Appel, The Declaratory Judgment Response to a Cease and Desist Letter: "First-to-File" or "Procedural Fencing", 96 Trademark Rep. 639 (2006).

and thus establish Article III jurisdiction.[9] To the extent one might worry that allowing declaratory litigation might supersede or even supplant already-ongoing administrative TTAB proceedings, or that it might impede efforts by parties to secure an informal resolution through correspondence and personal negotiation, we note that there exists a more appropriate venue for addressing such concerns: Before assuming declaratory judgment jurisdiction, a district court must not only consider its Article III authority to hear the case, it is also free to consider a range of other discretionary factors in assessing whether or not to exercise jurisdiction under the Act. *See supra* Part II; *infra* Part V. At the end of the day, however, such discretionary considerations should not be confused with, or included in, the very different and non-discretionary assessment whether the Article III case-or-controversy requirement has been satisfied.

---

[9] *See, e.g.*, *Chesebrough-Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 393, 396-97 (9th Cir. 1982) (finding an actual controversy where notice of opposition was filed in conjunction with a letter threatening an opposition filing and claiming a "likelihood of confusion"); *HSI IP v. Champion Window Mfg. & Supply Co.*, 510 F. Supp. 2d 948, 956 (M.D. Fla. 2007) ("While [Defendant] is correct that the filing of a TTAB action is not, on its own, sufficient to create an actual controversy, such is not the issue in this case where it is undisputed that in addition to filing an opposition in the TTAB proceedings, [Defendant] sent correspondence to [Plaintiff] suggesting it would sue if its [infringement] concerns 'could not be settled on an amicable basis.'"); *Jeffrey Banks, LTD v. Jos. A Bank Clothiers, Inc.*, 619 F. Supp. 998, 1002 (D. Md. 1985) (finding an actual controversy where prior claims of infringement and threats of litigation had cast a "threatening shadow" that was "made more ominous by the notice of opposition.").

# V

Though we hold that the district court has jurisdiction to entertain this case, the question remains whether, as a discretionary matter, it *should* do so. As we noted above, *see supra* Part II, the Declaratory Judgment Act does not demand that a district court decide every declaratory suit brought to it even where the court has the power to do so. Instead, once the court is satisfied that Article III's jurisdictional requirements are met, it must then consider a number of factors, including those previously set out by this court in *Mhoon*, to determine whether the suit warrants the district court's attention. These factors include:

> [1] whether a declaratory action would settle the controversy; [2] whether it would serve a useful purpose in clarifying the legal relations at issue; [3] whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race to *res judicata* "; [4] whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and [5] whether there is an alternative remedy which is better or more effective.

*Mhoon*, 31 F.3d at 983.

In this case, the district court never reached the issue whether it *should*, as a matter of statutory discretion, consider Surefoot UT's request for declaratory relief because it held that, by failing to present a case or controversy, the suit *could not* be entertained at all. Now, of course, the discretionary question must be faced and answered. Rather than tackling it ourselves, we believe the appropriate course is to afford the district court the opportunity to evaluate it in

the first instance. In this vein, we are guided again by *MedImmune* where, after holding that Article III jurisdiction existed, the Court explained that "it would be imprudent for us to decide whether the District Court should, or must, decline to issue the requested declaratory relief," and so held that "[w]e leave the equitable, prudential, and policy arguments in favor of such a discretionary dismissal for the lower courts' consideration on remand." 127 S. Ct. at 776-77. In doing so, the Court echoed its own previous direction in *Wilton v. Seven Falls Co.*, 515 U.S. 277, 289 (1995), where it said that "[w]e believe it more consistent with the statute to vest district courts with discretion in the first instance." So we say here, and further stress that we express no views on what the proper outcome of the district court's analysis should be.

\* \* \*

While the district court faithfully applied our precedent, since the time it issued its decision the Supreme Court has undone that precedent. Applying the Court's new direction in *MedImmune*, we conclude that Article III jurisdiction exists over this controversy and so must reverse the district court's contrary judgment. At the same time, acknowledging that discretionary considerations associated with Surefoot UT's invocation of the Declaratory Judgment Act remain

to be addressed, we remand this matter for further proceedings not inconsistent with this opinion.[10]

*Reversed and remanded.*

---

[10] We deem moot Sure Foot ND's motion to strike certain portions of Surefoot UT's Reply Brief that cited post-appeal communications between the parties as evidence of the likelihood of suit. The contested portion of Surefoot UT's filings played no role in our disposition of this matter.