**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 28, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

STEPHEN MURPHY,

Defendant - Appellant.

No. 06-4060

(D. Utah)

(D.C. No. 1:05-CR-00066-PGC)

**ORDER AND JUDGMENT**[*]

Before **HENRY**, **HOLLOWAY**, and **McCONNELL**, Circuit Judges.

After arresting the passenger of a vehicle driven by Stephen Murphy, police discovered two handguns, one of which had a defaced serial number. Mr. Murphy was subsequently indicted for unlawfully possessing a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k). Following the denial of his motion to suppress, Mr. Murphy conditionally pleaded guilty. He now appeals, reiterating his claims below that (1) he was unlawfully detained and (2) the search of the vehicle was not a valid search incident to arrest. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

# I. BACKGROUND

## A. DETENTION & SEARCH

On May 13, 2005, at approximately 12:45 a.m., Officer Bryce Weir of the Roy City Police Department observed a vehicle without its headlights on pull out from a row of parked cars in the parking lot of Kwik City Muffler, an automobile repair shop located on 4000 South Street in Roy, Utah. Officer Weir then observed the vehicle engage its headlights and turn onto the road. This vehicle was being driven by Mr. Murphy and contained one passenger, Joshua Baxter.

Officer Weir immediately suspected that a vehicle burglary was taking place because Kwik City Muffler was closed and kept cars awaiting service in its parking lot overnight. Officer Weir also testified that the neighborhood where Kwik City Muffler is located is known for its high incidence of automobile thefts and burglaries, especially in the spring. Officer Weir began following the vehicle but did not turn on his emergency lights or siren. Approximately 30 seconds later, without any direction from Officer Weir, Mr. Murphy pulled over to the side of the road.

After parking ten to fifteen feet behind the vehicle, Officer Weir approached it from the driver's side, identified himself, and informed Mr. Murphy that he was "not being detained" and was "free to leave at any time." Rec. vol. II, at 15. Officer Weir then asked Mr. Murphy to identify himself and explained his concerns regarding Mr. Murphy's presence in Kwik City Muffler's parking lot.

Mr. Murphy did not have a driver's license or any documentation connecting him

to the vehicle. He gave Officer Weir his name and date of birth, and stated that the vehicle belonged to his girlfriend, Heidi Wheelwright. He also denied being "at" Kwik City Muffler and told Officer Weir that he was just turning around to catch up to a friend's truck that had just passed. *Id.* at 16. Having not seen any other vehicles in the area "with lights or stopped or moving," Officer Weir "asked him what truck" and told Mr. Murphy that he did not believe him because he saw the vehicle's headlights turn on before it exited the parking lot. *Id.* Mr. Murphy insisted that he saw his friend's truck and had simply been turning around. Officer Weir then asked Mr. Baxter for his name and date of birth, but he refused to give them.

At 12:50 a.m., Officer Weir returned to his patrol car to run computer checks on Mr. Murphy and the vehicle. He also called police dispatch, reported a "suspicious circumstance," and requested back-up. *Id.* at 30. The computer check on Mr. Murphy revealed "a number of pages . . . of incidents," including arrests for "burglaries, thefts, and narcotics." *Id.* at 18-19. The check also indicated that Mr. Murphy was a member of the Silent Aryan Warriors, a white supremacist gang involved in local burglaries, thefts, and narcotics trafficking. The computer check on the vehicle confirmed Mr. Murphy's statement that Heidi Wheelwright was the vehicle's registered owner. *Id.* at 53-54.

At approximately 12:51 a.m., Officer Curtis Gibson arrived on the scene. Another officer, Brian Seward, also arrived around this time. Officer Weir then re-approached the vehicle to have Mr. Murphy "confirm what he was telling [him]." *Id.* at 20.

After briefly speaking with Mr. Murphy and asking him to step out of the vehicle,

-3-

Officer Weir asked Mr. Baxter if he would step out of the car and speak with him. Mr. Baxter agreed. Officer Weir repeated his concerns regarding the pair's presence in the parking lot and again asked Mr. Baxter for his name and date of birth. Rather than refusing outright, Mr. Baxter offered a name and a July 15, 1984 date of birth. After checking this information on his computer and conducting some further questioning, Officer Weir learned that Mr. Baxter had lied. After Officer Weir informed him of this discovery, Mr. Baxter gave a different name and birth date. Officer Weir soon learned this information was also false. Mr. Baxter then provided a social security number.

Meanwhile, Officer Gibson "had [Mr. Murphy] sit on the curb" and continued to question him about "whether he had permission to be in possession of the vehicle." *Id.* at 64. During their conversation, Mr. Murphy gave Officer Gibson a room number at a motel where he said Ms. Wheelright could be reached. Officer Gibson radioed an officer from the Ogden Police Department to go to this motel and speak to Ms. Wheelright. Fifteen minutes later, Officer Gibson learned that the officer was unable to contact Ms. Wheelright at the motel.

Shortly thereafter, Officer Weir's computer check of the social security number proffered by Mr. Baxter revealed two outstanding warrants for his arrest. At approximately 1:25 a.m., Mr. Baxter was arrested, handcuffed, and placed in the back seat of Officer Weir's patrol car.

At 1:26 a.m., an officer from the Riverdale Police Department arrived to conduct a K-9 search of the car. The K-9 search began almost immediately after the officer arrived

and lasted "a couple of minutes." *Id.* at 27. After the dog failed to alert, Officer Weir conducted a hand search of the vehicle's passenger compartment. He discovered a bag containing two firearms, one of which had a defaced serial number. Around 2:00 a.m., Mr. Murphy was arrested.

## B. PROCEDURAL BACKGROUND

Mr. Murphy was charged with one count of possessing a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k). He filed a motion to suppress the firearm.

After a hearing at which Officers Weir, Gibson, and Seward testified, the district court denied Mr. Murphy's motion. Although evidence was introduced that the encounter between the officers and Mr. Murphy was consensual, the district court concluded that Mr. Murphy's detention was valid under the Fourth Amendment because reasonable suspicion to detain Mr. Murphy "immediately arose" during his initial encounter with Officer Weir and persisted throughout the detention. Rec. vol. III, doc. 55, at 7-10. The district court also held that Officer Weir discovered the gun through a valid search incident to arrest under *New York v. Belton*, 453 U.S. 454 (1981).

Mr. Murphy conditionally pleaded guilty and was sentenced to 51 months' imprisonment and 36 months' supervised release. He timely filed a notice of appeal.

## II.

On appeal, Mr. Murphy challenges both the reasonableness of his detention and the propriety of the search that yielded the gun.

## A. STANDARD OF REVIEW

We review the district court's factual findings underlying a motion to suppress for clear error, but review its legal determinations de novo. *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005). When a suppression motion has been denied, the evidence is viewed in the light most favorable to the government. *Id.*

## B. LAWFULNESS OF DETENTION

On appeal, Mr. Murphy concedes that he voluntarily pulled over and that Officer Weir permissibly approached his vehicle, asked questions, and requested information. *United States v. Drayton*, 536 U.S. 194, 200 (2002) ("Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen."). Neither Mr. Murphy nor the government, however, pinpoint the precise moment when the initially consensual encounter became an involuntary detention. Thus, we adopt the view of the district court that Mr. Murphy was detained within the meaning of the Fourth Amendment when Officer Weir returned from his patrol car and resumed his questioning.

Under *Terry v. Ohio*, 392 U.S. 1 (1968), an officer may briefly detain an individual for investigatory purposes without violating the Fourth Amendment "when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30). We analyze an investigative detention by employing a "two-part test." *United States v. West*, 219 F.3d

1171, 1176 (10th Cir. 2000). First, we ask whether the detention was supported by reasonable suspicion. Second, we ask whether the detention was reasonable in scope and duration. *Id.*

The district court concluded that Officer Weir and the other officers had reasonable suspicion to detain Mr. Murphy based on the following factual findings: Mr. Murphy "lied" to Officer Weir "about . . . prowling without his lights in an area where there were a number of vehicles parked," Rec. vol. III, doc. 55, at 7; the vehicle "was registered in the name of different person," *id.* at 10; Mr. Murphy had multiple prior contacts with law enforcement and was a member of a "very dangerous and violent, active gang," *id.* at 8; and Mr. Murphy was in the company of a felon with warrants out who "would have been a confederate to any burglary that was involved with the defendant," *id.* at 10.

Mr. Murphy first challenges several of the district court's factual findings. He then argues that his detention was neither supported by reasonable suspicion nor reasonable in scope, thereby rendering the firearm the fruit of an illegal detention.

1.    Factual Findings

"A finding of fact is clearly erroneous if it is without factual support in the record or if [we], after reviewing all the evidence, [are] left with a definite and firm conviction that a mistake has been made." *Manning v. United States*, 146 F.3d 808, 812 (10th Cir. 1998) (internal quotation marks omitted). Viewing the evidence in the light most favorable to the government, we are not convinced that any of the district court's findings

lack factual support, nor are we persuaded that a mistake was made. For the sake of judicial economy, we do not address each of Mr. Murphy's challenges separately. We note, however, that each of the district court's findings was properly drawn from the uncontradicted testimony of Officers Weir, Gibson, and Seward. We therefore accept the district court's factual findings.

2.    Reasonable Suspicion

Reasonable suspicion is a "particularized and objective basis for suspecting the person stopped of criminal activity." *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (internal quotation marks omitted). In analyzing the presence of reasonable suspicion, we examine the totality of the circumstances and consider both the factors weighing for and against the existence of reasonable suspicion. *United States v. Ledesma*, 447 F.3d 1307, 1316 (10th Cir. 2006). We do not scrutinize each factor in isolation; we evaluate the factors en masse to discern whether, "viewed from the standpoint of an objectively reasonable police officer," there was a "particularized and objective basis" for suspecting legal wrongdoing. *Ornelas*, 517 U.S. at 695-96 (internal quotation marks omitted).

We hold that, from an objective standpoint, a reasonable officer standing in the shoes of Officer Weir could articulate numerous reasons for suspecting Mr. Murphy of criminal activity, namely vehicle burglary or theft. Before detaining Mr. Murphy, Officer Weir knew the following: Mr. Murphy had been in the parking lot of a closed business at nearly 1 a.m. and the business stored unattended vehicles in its parking lot; Mr. Murphy insisted he had only used the business's parking lot to turn around and follow a friend's

truck even though that was inconsistent with Officer Weir's own observations; and Mr. Murphy failed to provide a driver's license or any documentation linking himself to the vehicle. *See United States v. Hendricks*, 319 F.3d 993, 1002 (7th Cir. 2003) (vehicle "parked at [an early] hour of the morning behind a closed business" supports reasonable suspicion of a burglary); *United States v. Moore*, 22 F.3d 241, 243-44 (10th Cir. 1994) (a suspect's lying to officers supports reasonable suspicion of criminal activity); *United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir. 1994) ("the defendant's lack of a valid registration, license, bill of sale, or some other indicia of proof to lawfully operate and possess the vehicle in question, . . . giv[es] rise to objectively reasonable suspicion that the vehicle may be stolen."). Moreover, Mr. Murphy's conduct took place in a neighborhood known for its high incidence of automobile thefts and burglaries. *See United States v. Dennison*, 410 F.3d 1203, 1208 (10th Cir. 2005) ("presence in a high crime area" supports determination of reasonable suspicion) (quoting *Wardlow*, 528 U.S. at 124).

Mr. Murphy essentially argues that any reasonable suspicion of a vehicle theft dissipated once Officer Weir returned to his car and learned that (1) "[t]he vehicle was not reported stolen," (2) Mr. Murphy truthfully provided Officer Weir "with the name of, and the nature of his relationship with, the registered owner of the vehicle," and (3) the vehicle did not exhibit "any signs of vandalism that are common with stolen and/or burglarized vehicles." Aplt's Br. at 16.

We disagree. As an initial matter, the fact that the vehicle had not been reported

stolen is irrelevant because Officer Weir's observations would have led a reasonable officer to suspect that Mr. Murphy could have stolen the vehicle moments prior to detaining him. While it is true that Mr. Murphy correctly identified Ms. Wheelright as the registered owner and that the car did not bear any signs of vandalism, these facts are not particularly ameliorative given the assortment of suspicious factors in this case.

Indeed, if anything, the reasonable suspicion of criminal activity increased as the detention progressed because Officer Weir's initial suspicions never abated and additional suspicious circumstances came to light. First, while at his car, Officer Weir discovered Mr. Murphy was a gang member with a significant arrest record. *United States v. Feliciano*, 45 F.3d 1070, 1074 (7th Cir. 1995) ("[G]ang association and recent relevant criminal conduct, while of doubtful *evidentiary* value in view of the strictures against proving guilt by association or by a predisposition based on past criminal acts, is a permissible component of the articulable suspicion required for a *Terry* stop."). Several minutes later, the police discovered that Mr. Murphy's passenger, Mr. Baxter, had lied about his name and had two outstanding warrants for his arrest. *See Dennison*, 410 F.3d at 1212-13 (outstanding warrants for passenger's arrest supports determination of reasonable suspicion of a threat to officer safety); *Wyoming v. Houghton*, 526 U.S. 295, 304-05 ("[A] car passenger . . . will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or evidence of their wrongdoing."). Finally, the officers, despite their attempts to contact the vehicle's registered owner, were not able to confirm that Mr. Murphy had permission to possess it.

The officers therefore had reasonable suspicion to detain and question Mr. Murphy.

3.    Reasonable in Scope

Mr. Murphy alternatively argues that "his hour-plus detention" was unreasonable because it exceeded the permissible scope of an investigatory detention and evolved into a de facto arrest.  Aplt's Br. at 16.

An investigative detention may become an arrest if it lasts for an unreasonably long time.  *United States v. Sharpe*, 470 U.S. 675, 685 (1985).  There are, however, no "hard-and-fast time limits" for an investigative detention, *United States v. Montoya De Hernandez*, 473 U.S. 531, 543 (1985), and, in determining a detention's validity, we must "consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Sharpe*, 470 U.S. at 685.  Accordingly, "[i]n assessing whether a detention is too long in duration to be justified as an investigative stop, we . . . examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* at 686.

Here, nothing in the record indicates that the officers were dilatory in carrying out their on-the-scene investigation.  From questioning Mr. Murphy to attempting to contact Ms. Wheelright at the motel, the officers' investigatory acts proceeded in a logical sequence.  Furthermore, according to Officer Gibson's uncontradicted account, the officers were "still trying to investigate" whether Mr. Murphy had permission to have the vehicle following Mr. Baxter's arrest.  Rec. vol. II, at 68.  Nothing in the record indicates

-11-

that the officers were doing otherwise when the firearms were discovered.

Mr. Murphy argues that the length of his detention was unreasonable by suggesting that the officers should have "traveled back up the road a half a block to investigate the automobiles" at Kwik City Muffler. Aplt's Br. at 16-17. In hindsight, this might have been one way for the officers to approach the investigation; nevertheless, the officers' decision not to go to Kwik City Muffler does not discredit the approach they actually employed. *Sharpe*, 470 U.S. at 686-87 ("A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But the fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, itself, render the search unreasonable.") (alterations and internal quotation marks omitted). Thus, Mr. Murphy's detention was reasonable in scope.

Accordingly, we hold that Mr. Murphy's detention did not run afoul of the Fourth Amendment.

### C. SEARCH INCIDENT TO ARREST

Mr. Murphy next argues that the firearm was not discovered during a valid search incident to arrest and, consequently, should be suppressed as the fruit of an illegal search.

The Fourth Amendment prohibits unreasonable searches, but it is well established that, "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *New York v. Belton*, 453 U.S. 454, 460 (1981). An

-12-

officer's right to conduct such a search is based on "the need [of police officers] to remove any weapons that [the arrestee] might seek to use in order to resist arrest or effect his escape and the need to prevent the concealment or destruction of evidence." *Id.* at 457 (internal quotation marks omitted).

Mr. Murphy argues that the firearm was not discovered during a valid search incident to arrest because Mr. Baxter was handcuffed and secured in the backseat of Officer Weir's patrol car when the search was conducted. Specifically, he posits that applying the search incident to arrest exception to this case "perverts the rationale underlying the *Belton* rule" because "there was no way Baxter could have access to Murphy's vehicle." Aplt's Br. at 18 (internal quotation marks omitted).

The Supreme Court has never directly addressed the question whether the search incident to arrest exception applies when an arrestee is handcuffed and inside a patrol car during the search. Nonetheless, the Court recently sanctioned a search under *Belton* where it was performed after a police officer "handcuffed [the arrestee] . . . and placed him in the back seat of the patrol car." *Thornton v. United States*, 541 U.S. 615, 618, 623-24 (2004) (affirmatively answering the question whether *Belton* applied to "recent occupant[s]" of automobiles).

Similarly, we have approved searches of automobiles incident to arrest under *Belton* when the arrestee was handcuffed and in a patrol car during the search. *See e.g., United States v. Humphrey*, 208 F.3d 1190, 1202 (10th Cir. 2000) (reasoning that "*Belton* emphasized that its holding created a 'bright line' rule intended to provide specific and

coherent guidance to officers in the field"). We have, however, refused to apply the search incident to arrest exception when a search was "remote in time or place from the arrest." *Dennison*, 410 F.3d at 1210 (quotations omitted). *See, e.g.*, *United States v. Lugo*, 978 F.2d 631, 635 (10th Cir. 1992) (*Belton* rule inapplicable when defendant "had been taken from the scene" and "was handcuffed and sitting in the back seat of a patrol car proceeding toward [the jail]" during the search); *United States v. Edwards*, 242 F.3d 928, 937 (10th Cir. 2001) (*Belton* rule inapplicable when defendant "was incapacitated with handcuffs and sitting in the back of a police car approximately 100-150 feet away" during search and there was "no evidence whatsoever that [defendant] had any control over the *rental* car immediately preceding or at the time of his arrest").

In light of the Supreme Court's decision in *Thornton* and our decision in *Humphrey*, we hold that Officer Weir's search was a valid search incident to arrest. Like the arrestees in *Thornton* and *Humphrey*, Mr. Baxter was handcuffed and seated in Officer Weir's patrol when the firearm was discovered. Furthermore, unlike *Lugo* and *Edwards*, where the arrestees were large distances away from the location of the search, the record indicates that Officer Weir's patrol car was parked only ten to fifteen feet away from the searched vehicle.

III

For the foregoing reasons, we AFFIRM the district court's denial of Mr. Murphy's motion to suppress.


Entered for the Court,


Robert H. Henry
Circuit Judge