FILED
United States Court of Appeals
Tenth Circuit

July 28, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

MARKICE LAVERT McCANE,

        Defendant - Appellant.

No. 08-6235

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. NO. 5:07-CR-00286-C-1)**

---

William H. Campbell, Campbell Law Office, Oklahoma City, Oklahoma, for Defendant-Appellant.

Edward J. Kumiega, Assistant United States Attorney (John C. Richter, United States Attorney, with him on the briefs), Oklahoma City, Oklahoma, for Plaintiff-Appellee.

---

Before **MURPHY**, **ANDERSON**, and **TYMKOVICH**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

# I. INTRODUCTION

In April 2007, Defendant-Appellant Markice McCane was stopped for a suspected traffic violation by an Oklahoma City police officer. After determining McCane was driving under a suspended license, the officer arrested McCane, handcuffed him, and placed him in the back seat of the patrol car. The officer then conducted a search of the passenger compartment of the vehicle and discovered a firearm in the pocket of the driver's side door. McCane was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). McCane filed a motion to suppress the firearm as fruit of an unlawful search. The district court denied the motion, concluding the search was properly undertaken as incident to a lawful arrest. While the case was pending on appeal, the United States Supreme Court issued its decision in *Arizona v. Gant*, 129 S. Ct. 1710 (2009). In *Gant*, the Court concluded a vehicle search is not valid as incident to a lawful arrest when a defendant is stopped for a traffic violation and handcuffed in the back of the patrol car at the time of the search. *Id.* at 1719. In light of *Gant*, the district court erred in concluding the search was valid as incident to a lawful arrest. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we nevertheless **affirm** the district court's denial of the motion to suppress based upon the good-faith exception to the exclusionary rule.

## II. BACKGROUND

On April 18, 2007, Officer Aaron Ulman of the Oklahoma City Police Department was patrolling his precinct when he observed a vehicle traveling eastbound on a four-lane thoroughfare. The vehicle was straddling the center line of the two eastbound lanes. After following the vehicle for approximately three blocks, Officer Ulman decided to conduct a traffic stop based upon his belief the driver was violating state traffic law and his suspicion the driver was intoxicated. After pulling the vehicle over to the side of the road, Officer Ulman approached the vehicle and asked the driver, later identified as McCane, for his license and insurance information. A passenger, Joseph Carr, was also in the vehicle.

After McCane informed him that his license was suspended, Officer Ulman asked McCane to exit the vehicle and accompany him to the patrol car. McCane complied, and Carr remained in the front seat of the vehicle. Upon exiting the vehicle, McCane left the driver's door open, and the door remained open for the duration of the stop. Officer Ulman conducted a pat-down search of McCane and placed him in the back seat of the patrol car. Officer Ulman then conducted a records check, which indicated McCane's license was suspended and the vehicle was not registered to McCane. At that time, Officer Ulman arrested McCane for driving with a suspended license, placed him in handcuffs, and again placed him in the back seat of the patrol car. After requesting dispatch to contact a wrecker service to tow the vehicle, Officer Ulman asked Carr to exit the vehicle and sit in

the back seat of the patrol car along with McCane. Carr did so, and Officer

Ulman then searched the passenger compartment of the car.

During the search, Ulman discovered a .25 caliber firearm hidden under a

rag in the side pocket of the open door. The firearm was loaded with a magazine

containing seven rounds of ammunition. Officer Ulman removed the firearm from

the vehicle and took it back to the patrol car in order to secure it. The patrol car

was parked directly behind McCane's vehicle. According to Officer Ulman, when

McCane saw the firearm he stated, "I forgot that was even there." Officer Ulman

then advised McCane of his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436

(1966)), and McCane did not make any additional statements. After the vehicle

was impounded, Carr was released, and McCane was transported to the police

station for booking.

McCane was charged with being a felon in possession of a firearm in

violation of 18 U.S.C. § 922(g)(1). Before the district court, McCane filed

motions to suppress the firearm and exclude his alleged inculpatory statement.

The district court denied these motions, concluding the statement was made

voluntarily and the search of McCane's vehicle did not violate the Fourth

Amendment because it was properly undertaken as a search incident to lawful

arrest. Following a jury trial, McCane was found guilty of the charged offense.

McCane then appealed to this court alleging: (1) the district court erred in

denying his pretrial motions to suppress the evidence stemming from the search of

his vehicle; (2) insufficient evidence existed from which to convict him of the offense; and (3) the felon in possession statute at 18 U.S.C. § 922(g)(1) is unconstitutional in light of the Supreme Court's decision in *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008).

While the case was pending before this court, the Supreme Court issued its decision in *Arizona v. Gant*. 129 S. Ct. 1710. On facts almost identical to the facts of this case, the Supreme Court held that the search-incident-to-lawful-arrest exception to the warrant requirement of the Fourth Amendment is not applicable when a defendant has been arrested for a traffic violation and remains handcuffed in the back of a patrol car while the search is conducted. *Id.* at 1719. After noting that lower courts have widely upheld searches "in this precise factual scenario," the Court stated that an officer may "search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search" or when it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Id.* at 1718-19 (quotations omitted).

The parties agree that, in light of *Gant*, the district court erred in denying the motion to suppress the firearm on the grounds that the search was proper as incident to lawful arrest. The parties disagree, however, as to whether the district court's denial of the motion to suppress can be affirmed on an alternative ground. Thus, the issues now before the court are: (1) whether the district court's denial

of the motion to suppress the firearm may be affirmed based upon the good-faith

exception to the exclusionary rule or the inevitable discovery doctrine, (2)

whether sufficient evidence existed on which to convict McCane, and (3) whether

18 U.S.C. § 922(g) is constitutional.[1]

## III.  DISCUSSION

### A.      Motion to Suppress

This court may affirm the district court on any basis supported by the

record.  *Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 825 (10th Cir. 2008).  As

an alternative ground for affirming the district court's decision to deny the motion

to suppress the firearm as fruit of an unlawful search, the government claims that

Officer Ulman reasonably relied upon settled pre-*Gant* Tenth Circuit case law,

and the good-faith exception to the exclusionary rule should be extended to this

---

[1]McCane makes a number of additional arguments in his opening brief which do not merit further analysis.  First, McCane appears to argue that because Officer Ulman was not a credible witness, McCane's alleged inculpatory statement should have been suppressed and the initial traffic stop should not have been upheld.  The determination of credibility, however, is within the province of the district court, and it was well within the district court's discretion to credit the testimony of Officer Ulman.  *United States v. Kimoana*, 383 F.3d 1215, 1220 (10th Cir. 2004).  Second, McCane argues that probable cause, not reasonable suspicion, must exist in order for an officer to conduct a stop for a perceived traffic violation.  This argument is foreclosed by circuit precedent.  *United States v. Vazquez*, 555 F.3d 923, 928 (10th Cir. 2009) ("A traffic stop is permissible under the Fourth Amendment if the officer has a reasonable articulable suspicion that a traffic violation has occurred or is occurring." (quotation omitted)).

search.[2]  To prevail on this alternative ground, the government must establish that the search of the vehicle was supported by extant Tenth Circuit precedent and that the principle of deterrence underlying the exclusionary rule is not undermined.

        1.        Pre-*Gant* Tenth Circuit Precedent

        The Supreme Court in *Gant* expressed concern that its precedent, *New York v. Belton*, 453 U.S. 454 (1981), was being generally applied far beyond the underlying justifications for warrantless vehicle searches incident to arrest of a recent occupant, i.e., officer safety and preservation of evidence.  *Gant*, 129 S. Ct. at 1718-19.  It observed that *Belton* "has been widely understood to allow a vehicle search incident to the arrest of a recent occupant even if there is no possibility the arrestee could gain access to the vehicle at the time of the search." *Id.* at 1718.  Tenth Circuit precedent anteceding *Gant* was not an exception.

        The decision in *United States v. Humphrey*, 208 F.3d 1190 (10th Cir. 2000), is exemplary of this circuit's precedent and is factually indistinguishable from the instant case.  In *Humphrey*, the defendant was stopped for a traffic violation, arrested on the basis of an outstanding warrant, and handcuffed in the patrol car at the time of the search of his vehicle.  *See id.* at 1202.  The defendant's arguments that neither officer safety nor preservation of evidence were in play were to no

---

        [2]The Supreme Court has indicated that in applying the good-faith exception to the exclusionary rule, "the standard of reasonableness [] is an objective one; the standard does not turn on the subjective good faith of individual officers." *Illinois v. Krull*, 480 U.S. 340, 355 (1987).

avail.  *Id.*  This court held the search was proper "without regard to the fact that the search occurred after Defendant had been restrained and without regard to the nature of the offense for which he was arrested."  *Id.* (citation omitted).  Other circuit opinions are consistent with *Humphrey*.[3]  *United States v. Brothers*, 438 F.3d 1068, 1073 (10th Cir. 2006) (upholding search undertaken incident to lawful arrest after the defendant had been restrained, but before the defendant was removed from the scene of the arrest)[4]; *United States v. Cotton*, 751 F.2d 1146, 1148-49 (10th Cir. 1985); *United States v. Murphy*, 221 Fed. Appx. 715, 721-22 (10th Cir. 2007) (unpublished disposition).  The search in this case was wholly consistent with and supported by this court's precedent prior to *Gant*.

---

[3]Contrary to McCane's assertion, the decision in *United States v. Edwards*, 242 F.3d 928, 937-38 (10th Cir. 2001), does not hold otherwise.  In *Edwards*, this court concluded a search could not be justified as incident to lawful arrest because the arrestee had not been in the vehicle, and thus the contents of the vehicle could not have been in his immediate control, during the relevant time period preceding the arrest.  *Id.* at 938.  The court explained that because the defendant was 100-150 feet away from the car at the time he was arrested, there was no evidence that he had control over the vehicle immediately prior to or at the time of his arrest.  *Id.*  The time for a proper search incident to arrest had passed by the time he was handcuffed and placed in the police car 100-150 feet away from his vehicle.  *Id.*  The instant case is different: there is no dispute McCane was in his car during the relevant time period preceding the stop and arrest.

[4]In *United States v. Lugo*, the defendant was in a moving police car en route to the police station at the time the vehicle was searched.  978 F.2d 631, 635 (10th Cir. 1992).  Because the search occurred *after the defendant had left the scene*, it was too remote in time and place from the arrest to constitute a search incident to lawful arrest.  *Id.  See also United States v. Dennison*, 410 F.3d 1203, 1209 (10th Cir. 2005).  In the instant case, there is no dispute McCane was still at the scene of the arrest when the search occurred.

2.      Application of the Good-Faith Exception to the Exclusionary Rule

"The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, but contains no provision expressly precluding the use of evidence obtained in violation of its commands." *Herring v. United States*, 129 S. Ct. 695, 699 (2009) (quotations omitted).  There is, however, the judicially created exclusionary rule which, when applied, excludes evidence obtained in violation of the Fourth Amendment from being used at trial.  *Id.*  The exclusionary "rule is designed to safeguard Fourth Amendment rights generally through its deterrent effect." *Id.* (quotation omitted).  "The fact that a Fourth Amendment violation occurred—i.e., that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies." *Id.* at 700.

"The exclusionary rule is not an individual right and applies only where it results in appreciable deterrence." *Id.* (quotations omitted).  Because the purpose of the exclusionary rule is to deter police misconduct, *United States v. Leon,* 468 U.S. 897, 906 (1984), in determining whether to apply the rule the court is to weigh the benefits of the resulting deterrence against the costs of applying the rule. *Herring*, 129 S. Ct. at 700.  "The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free—something that offends basic concepts of the criminal justice system." *Id.* at 701 (quotation omitted).  Consequently, "[t]he rule's costly toll upon truth-seeking and law

enforcement objectives presents a high obstacle for those urging its application."

*Id.* (quotation omitted).

Various principles have been established to limit the application of the exclusionary rule. *Id.* at 700. One such principle is the good-faith exception. *Id.* at 701. In *Leon*, the Supreme Court established the good-faith exception to the exclusionary rule, declining to apply the exclusionary rule when police reasonably and in good faith relied upon a warrant subsequently declared invalid. 468 U.S. at 922. The Court, relying on the deterrent purpose of the exclusionary rule, determined it was improper to apply the rule in this context, explaining:

> First, the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. Second, there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion. [] Third, and most important, we discern no basis, and are offered none, for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate. . . . Judges and magistrates are not adjuncts to the law enforcement team; as neutral judicial officers, they have no stake in the outcome of particular criminal prosecutions. The threat of exclusion thus cannot be expected significantly to deter them.

*Id.* at 916-17 (footnote omitted). The Court concluded the exclusionary rule "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity." *Id.* at 919.

In *Illinois v. Krull*, the Court extended the good-faith exception to warrantless administrative searches performed in reliance upon a statute later

-10-

declared unconstitutional. 480 U.S. 340, 349-53 (1987). The Court first explained that applying the exclusionary rule in this situation would have little deterrent effect on the officer's actions, stating:

> Unless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law. If the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute as written. To paraphrase the Court's comment in *Leon*: Penalizing the officer for the legislature's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.

*Id.* at 349-50 (quotation omitted). The Court then noted that the exclusionary rule was aimed at deterring misconduct on the part of police, not legislators. *Id.* at 350. To the extent consideration of the deterrent effect upon legislators was appropriate, however, the initial inquiry was whether there was "evidence to suggest that legislators are inclined to ignore or subvert the Fourth Amendment." *Id.* (quotation omitted). In answering this question in the negative, the Court stated that, "[a]lthough legislators are not neutral judicial officers, as are judges and magistrates, neither are they adjuncts to the law enforcement team." *Id.* at 350-51 (citation and quotation omitted). In enacting laws to carry out the criminal justice system, "legislators' deliberations of necessity are significantly different from the hurried judgment of a law enforcement officer engaged in the often competitive enterprise of ferreting out crime." *Id.* at 351 (quotation

-11-

omitted). Finally, the Court noted that even if it were to conclude that legislators were distinguishable from officers of the judicial system, there was "no reason to believe that applying the exclusionary rule will have [a deterrent] effect. Legislators enact statutes for broad, programmatic purposes, not for the purpose of procuring evidence in particular criminal investigations." *Id.* at 352.

The Court next extended the good-faith exception to police reliance upon mistaken information in a court's database indicating an arrest warrant was outstanding. *Arizona v. Evans*, 514 U.S. 1, 14-16 (1995). In *Evans*, the Court explained that the mistake of a judicial employee would not justify exclusion of evidence for three reasons: (1) the exclusionary rule was established to deter *police* misconduct, not the conduct of court employees; (2) there was no evidence court employees were likely to "ignore or subvert the Fourth Amendment"; and (3) there was no basis for believing application of the exclusionary rule would deter the conduct at issue since "court clerks are not adjuncts to the law enforcement team engaged in the often competitive enterprise of ferreting out crime, they have no stake in the outcome of particular criminal prosecutions." *Id.* at 14-15 (citation omitted).

Finally, in its recent good-faith decision, *Herring*, the Court extended the good-faith exception to police reliance upon the negligent mistake of a fellow law enforcement employee, as opposed to a neutral third party. 129 S. Ct. at 704. In *Herring*, the court applied the good-faith exception where, in making an arrest,

-12-

police relied upon a record-keeping error in the police computer database indicating there was an active warrant for the arrestee. *Id.* at 698, 702-04. In discussing the principles of the exclusionary rule, the Court stated that "[t]he extent to which the exclusionary rule is justified by [] deterrence principles varies with the culpability of the law enforcement conduct." *Id.* at 701. Thus, "assessment of the flagrancy of the police misconduct constitutes an important step in the calculus of applying the exclusionary rule." *Id.* (quotation omitted).

The Court went on to explain that "evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Id.* (quotations omitted). As such, "the [past] abuses that gave rise to the exclusionary rule featured intentional conduct that was patently unconstitutional." *Id.* at 702. The Court concluded the conduct at issue did not rise to this level, clarifying that the good-faith inquiry "is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." *Id.* at 703 (quotations omitted).

Two inseparable principles have emerged from the Supreme Court cases and each builds upon the underlying purpose of the exclusionary rule: deterrence. First, the exclusionary rule seeks to deter objectively unreasonable police conduct, i.e., conduct which an officer knows or should know violates the Fourth

-13-

Amendment. *See, e.g., Herring,* 129 S. Ct. at 701-04; *Krull*, 480 U.S. at 348-49. Second, the purpose of the exclusionary rule is to deter misconduct by law enforcement officers, not other entities, and even if it was appropriate to consider the deterrent effect of the exclusionary rule on other institutions, there would be no significant deterrent effect in excluding evidence based upon the mistakes of those uninvolved in or attenuated from law enforcement. *See, e.g., Evans*, 514 U.S. at 14-15; *Krull,* 480 U.S. at 351-52; *Leon*, 468 U.S. at 916-17. Based upon these principles, we agree with the government that it would be proper for this court to apply the good-faith exception to a search justified under the settled case law of a United States Court of Appeals, but later rendered unconstitutional by a Supreme Court decision.

Just as there is no misconduct on the part of a law enforcement officer who reasonably relies upon the mistake of a court employee in entering data, *Evans*, 514 U.S. at 15, or the mistake of a legislature in passing a statute later determined to be unconstitutional, *Krull*, 480 U.S. at 349-50, a police officer who undertakes a search in reasonable reliance upon the settled case law of a United States Court of Appeals, even though the search is later deemed invalid by Supreme Court decision, has not engaged in misconduct.[5] The refrain in *Leon* and the succession

_____

[5]McCane argues the retroactivity rule announced in *Griffith v. Kentucky*, 479 U.S. 314, 322-23 (1987), requires application of the Supreme Court's holding in *Gant* to this case. The issue before us, however, is not whether the Court's ruling in *Gant* applies to this case, it is instead a question of the proper remedy

(continued...)

-14-

of Supreme Court good-faith cases is that the exclusionary rule should not be applied to "objectively reasonable law enforcement activity." 486 U.S. at 919. Relying upon the settled case law of a United States Court of Appeals certainly qualifies as objectively reasonable law enforcement behavior.

The Supreme Court's line of good-faith cases clearly indicates that the reach of the exclusionary rule does not extend beyond police conduct to punish the mistakes of others, be they judicial officers or employees, or even legislators. *Evans*, 514 U.S. at 14 ("[T]he exclusionary rule was historically designed as a means of deterring police misconduct, not mistakes by court employees."); *Krull,* 480 U.S. at 350 ("We noted in *Leon* as an initial matter that the exclusionary rule was aimed at deterring police misconduct. Thus, legislators, like judicial officers, are not the focus of the rule." (citation omitted)); *Leon*, 468 U.S. at 916 ("[T]he exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates."). In the case of judicial officers, the Supreme

_____

[5](...continued)
upon application of *Gant* to this case. In *Leon*, the Supreme Court considered the tension between the retroactive application of Fourth Amendment decisions to pending cases and the good-faith exception to the exclusionary rule, stating that retroactivity in this context "has been assessed largely in terms of the contribution retroactivity might make to the deterrence of police misconduct." 468 U.S. at 897, 912-13. The lack of deterrence likely to result from excluding evidence from searches done in good-faith reliance upon settled circuit precedent indicates the good-faith exception should apply in this context. *See Krull*, 480 U.S. at 360 (declining to apply a court decision declaring a statute unconstitutional to a case pending at the time the decision was rendered and instead applying the good-faith exception to the exclusionary rule because the officer reasonably relied upon the statute in conducting the search).

Court has stated that "there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion." *Leon*, 468 U.S. at 916. Thus there is no basis for believing that excluding evidence resulting from an error of the court will "have a significant deterrent effect on the issuing judge[s]." *Id.* Courts are neutral arbiters charged with interpreting the law, and have "no stake in the outcome of particular criminal prosecutions." *Id.* at 917. Consequently, excluding evidence based on judicial error would serve no deterrent purpose. The Supreme Court has consistently relied upon the deterrent purpose of the exclusionary rule in deciding the scope of the good-faith exception. The Court has declined to apply the exclusionary rule when no deterrent effect would result from its application. Consistent with this practice, this court declines to apply the exclusionary rule when law enforcement officers act in objectively reasonable reliance upon the settled case law of a United States Court of Appeals.[6] The good-faith exception to the exclusionary

---

[6]We note that in *United States v. 15324 County Highway E.,* the Seventh Circuit declined to uphold a search based upon good-faith reliance on Seventh Circuit precedent later overturned by a Supreme Court decision, and instead upheld the search based upon the officer's good-faith reliance on a validly issued search warrant. 332 F.3d 1070, 1075-76 (7th Cir. 2003). In declining to extend the good-faith rule to reliance on circuit case law, the court reasoned that "[s]uch expansion of the good-faith exception would have undesirable, unintended consequences, principal among them being an implicit invitation to officers in the field to engage in the tasks—better left to the judiciary and members of the bar more generally—of legal research and analysis." *Id.* at 1076. In the instant case,

(continued...)

-16-

rule applies in this case. The district court therefore properly denied the motion to suppress.[7]

## B.     *Sufficiency of the Evidence*

This court reviews de novo the sufficiency of the evidence, "ask[ing] only whether taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. Brown*, 400 F.3d 1242, 1247 (10th Cir. 2005) (quotation omitted). This court does not "assess the credibility of witnesses or weigh conflicting evidence . . . [and] may reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quotation omitted). "In order to obtain a conviction against [a defendant] under § 922(g), the government was required to prove that [the defendant] had previously been convicted of a felony, [the defendant] thereafter knowingly possessed a firearm, and such possession was in or affected interstate commerce." *United States v. Michel*, 446 F.3d 1122, 1128 (10th Cir. 2006).

---

[6](...continued)
the Tenth Circuit jurisprudence supporting the search was settled. Thus, there was no risk that law enforcement officers would engage in the type of complex legal research and analysis better left to the judiciary and members of the bar.

[7]Because we uphold the search as valid under the good-faith doctrine, we need not decide whether the denial of McCane's motion to suppress could be affirmed based upon the inevitable discovery doctrine.

McCane claims there was insufficient evidence from which the jury could find he had possession of the firearm. Possession of a firearm for purposes of 18 U.S.C. § 922(g)(1) can be either actual or constructive. *Id.* "Actual possession exists when a person has direct physical control over a firearm at a given time." *United States v. Jameson*, 478 F.3d 1204, 1209 (10th Cir. 2007). "Constructive possession exists when a person knowingly holds the power and ability to exercise dominion and control over a firearm." *Id.* (quotation omitted).

"When a defendant has exclusive possession of the premises on which a firearm is found, knowledge, dominion, and control can be properly inferred because of the exclusive possession alone." *Id.* However, "[i]n cases of joint occupancy, where the government seeks to prove constructive possession by circumstantial evidence, it must present evidence to show some connection or nexus between the defendant and the firearm." *Michel*, 446 F.3d at 1128 (quotation omitted). "Proximity alone [] is insufficient to establish knowledge and access to (and dominion and control over) a firearm in a joint occupancy case." *Jameson*, 478 F.3d at 1209. "But when combined with other evidence in the case linking the defendant to the firearm, proximity is material and probative evidence that may be considered in deciding whether a defendant had knowledge of and access to (and dominion and control over) the [firearm]." *Id.* "[A]n inference of constructive possession is reasonable if the conclusion flows from

logical and probabilistic reasoning." *Michel*, 446 F.3d at 1128-29 (quotation omitted).

Officer Ulman testified that the firearm was located in the side pocket of the driver's door, "within inches of reach [of McCane] whenever the door [was] shut." In addition to his testimony regarding the proximity of the firearm to McCane, Officer Ulman testified that upon seeing the firearm, McCane stated, "I forgot that was even there." While McCane argues Officer Ulman was not a credible witness because he was "trying to save his felony arrest and obtain a conviction predicated on his actions," it was well within the discretion of the jury to credit Officer Ulman's testimony and this court will not assess the credibility of a witness on appeal. *United States v. Winder*, 557 F.3d 1129, 1137 (10th Cir. 2009). McCane's statement, together with the proximity of the firearm, supports the conclusion that McCane had knowledge of the firearm as well as the power and ability to exercise dominion and control over it. *See United States v. Hooks*, 551 F.3d 1205, 1213 (10th Cir. 2009) (concluding defendant's inculpatory statements along with other evidence regarding his earlier behavior and proximity to the firearm provided sufficient evidence from which a jury could find constructive possession of a firearm discovered beside a road). Thus, there existed sufficient evidence from which the jury could infer McCane's constructive possession of the firearm.

*C.* *The Constitutionality of 18 U.S.C. § 922(g)*

McCane first argues that in light of the Supreme Court's decision in *Heller*, in which the Court held that the Second Amendment provides an individual with a right to possess and use a handgun for lawful purposes within the home, 128 S. Ct. at 2822, § 922(g) violates the Second Amendment. The Supreme Court, however, explicitly stated in *Heller* that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." 128 S. Ct. at 2816-17; *see also United States v. Anderson*, 559 F.3d 348, 352 & n.6 (5th Cir. 2009) (rejecting the argument that § 922(g) is unconstitutional in light of *Heller*).

McCane next argues § 922(g) violates the Commerce Clause where, as here, the crime's only connection to interstate commerce is the firearm's crossing of state lines. This argument also lacks merit, as it has been explicitly rejected by this court. *See, e.g., United States v. Urbano*, 563 F.3d 1150, 1154 (10th Cir. 2009) (rejecting Commerce Clause challenge to § 922(g) based upon the alleged insufficient connection to interstate commerce and stating "if a firearm has traveled across state lines, the minimal nexus with interstate commerce is met and the statute can be constitutionally applied"); *United States v. Bolton*, 68 F.3d 396, 400 (10th Cir. 1995) (concluding "[§] 922(g)'s requirement that the firearm have been, at some time, in interstate commerce is sufficient to establish its

constitutionality under the Commerce Clause" (quotation omitted)). Thus, we reject each of McCane's arguments challenging the constitutionality of § 922(g).

## IV. CONCLUSION

For the reasons discussed above, we **affirm** the decision of the district court[8].

---

[8] Appellant's motion to strike Appellee's Notice of Supplemental Authority is denied.

**Tymkovich, J., concurring.**

I join in Judge Murphy's cogent opinion, but write separately regarding certain issues raised by our Second Amendment holding.

*District of Columbia v. Heller* instructs that it not be taken "to cast doubt on longstanding prohibitions on the possession of firearms by felons." 128 S. Ct. 2783, 2816–17 (2008). This instruction, as McCane points out, is dictum. But Supreme Court dicta binds us "almost as firmly as . . . the Court's outright holdings." *Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1243 (10th Cir. 2008) (quoting *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996)). This is particularly so where, as here, the dictum is recent and not enfeebled by later statements. *See id.; see also* Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial* Ipse Dixit, 60 Hastings L.J. 1371, 1372 (2009) ("Although [*Heller*'s] exceptions are arguably dicta, they are dicta of the strongest sort."). I therefore concur with the majority in rejecting McCane's Second Amendment challenge.

I write separately, though, for two reasons. The first is to note, given the undeveloped history of felon dispossession laws, the possible tension between *Heller*'s dictum and its underlying holding. The second reason is to express concern that the dictum inhibits lower courts from exploring the contours of *Heller* and its application to firearm restrictions.

My first point is that the felon dispossession dictum may lack the "longstanding" historical basis that *Heller* ascribes to it. Indeed, the scope of what *Heller* describes as "longstanding prohibitions on the possession of firearms by felons," 128 S. Ct. at 2816–17, is far from clear. To be sure, some sources would support the proposition. *See* Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?*, 36 Okla. L. Rev. 65, 96 (1983) ("Colonial and English societies of the eighteenth century . . . excluded . . . felons [from possessing firearms]."); Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 203, 266 (1983) ("Founders [did not] consider felons within the common law right to arms.").

But more recent authorities have *not* found evidence of longstanding dispossession laws. On the contrary, a number have specifically argued such laws did not exist and have questioned the sources relied upon by the earlier authorities. *See, e.g.*, Larson, *supra*, at 1374 (finding Kates's evidence of longstanding felon dispossession "surprisingly thin"); C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 709–10, 714 (2009) (challenging the evidence cited by both Dowlut and Kates).[1] Instead, they

---

[1] While Mr. Kates does not address this evidence specifically, he maintains "there is ample historical support for excluding [felons] from the right to arms: Nations which accepted the right to arms invariably extended that right only to virtuous citizens; and at common law felons were 'civilly dead,' having lost all rights including the right to possess property of any kind." Don B. Kates, *A*

(continued...)

assert, the weight of historical evidence suggests felon dispossession laws are creatures of the twentieth—rather than the eighteenth—century. *See, e.g.*, Marshall, *supra*, at 698–713 (comprehensively reviewing the history of state and federal dispossession laws); Larson, *supra*, at 1374 ("[S]o far as I can determine, no colonial or state law in eighteenth-century America formally restricted the ability of felons to own firearms."); Adam Winkler, Heller*'s Catch 22*, 56 UCLA L. Rev. 1551, 1561, 1563 (2009) (same). Together these authorities cast doubt on a categorical approach to felon dispossession laws.

This uncertain historical evidence is problematic in light of *Heller*'s Second Amendment interpretation. Central to the Court's holding are a detailed textual analysis and a comprehensive review of the Second Amendment's meaning at the time of its adoption. *Heller*, 128 S. Ct. at 2788–816. After conducting this analysis and review, *Heller* concludes the right "to keep and bear arms" is a corollary to the individual right of self-defense. *E.g.*, *id.* at 2817 ("[T]he inherent right of self-defense has been central to the Second Amendment right."). At the "core" of the Second Amendment right, the Court found, is self-defense in the home. *Id.* at 2818.

---

[1](...continued)
*Modern Historiography of the Second Amendment*, 56 UCLA L. Rev. 1211, 1231 n.100 (2009).

Knowing the meaning of the Second Amendment right and having identified its individual nature, the issue becomes what limits the government may place on the right. Indeed, this is where the Second Amendment rubber meets the road. The restrictive firearm ownership and licensing laws at issue in *Heller* violated the right, the Court found. *Id.* at 2817–21. But what about other laws? For example, the broad scope of 18 U.S.C. § 922(g)(1)—which *permanently* disqualifies *all* felons from possessing firearms—would conflict with the "core" self-defense right embodied in the Second Amendment. Non-violent felons, for example, certainly have the same right to self-defense in their homes as non-felons. The validity of § 922(g)(1) was not at issue in *Heller*, so presumably the lower courts would be left to sort out this restriction—as well as other restrictions—and to wrestle with any complexities in applying *Heller*. But the issue was not really left to the lower courts.

In what could be described as the opinion's *deus ex machina* dicta, *Heller* simply declared that nothing in it "cast[s] doubt on longstanding prohibitions on the possession of firearms by felons" or various other gun control laws. 128 S. Ct. at 2816–17. And that was it. These provisions, and the various regulations they encompassed, were supported without any explanation of how they would fare in light of the Second Amendment's original meaning. *See id.* at 2827

-4-

(Stevens, J., dissenting); *id.* at 2869–70 (Breyer, J., dissenting).[2]  The reason the

Court inserted these exceptions is unclear.  Given the uncertain pedigree of felon

dispossession laws, though, the dictum sanctioning their application while

simultaneously sidestepping the Second Amendment's original meaning is odd.

One wonders, at least with regard to felon dispossession, whether the *Heller*

dictum has swallowed the *Heller* rule.

   *Heller*'s felon dispossession dictum is particularly noteworthy considering

the scope of the § 922(g)(1) ban.  The statute prohibits firearm possession by any

person convicted of a felony, irrespective of the nature of the felony, the length of

time elapsed since the felony conviction, and the treatment of the felony by the

state in which the felon resides.  Every individual right has exceptions, of course,

and the application of § 922(g) to a violent felon such as Mr. McCane would

appear appropriate under any Second Amendment reading.  After all, felons lose

out on fundamental rights such as voting and serving on juries, and face

---

   [2]  In one sense, *Heller* did overturn Tenth Circuit case law on this issue.
Previously, we upheld the felon-in-possession statute against Second Amendment
attack under a collective-rights theory—i.e., that felons have no right to possess
firearms that are not reasonably connected to military service.  *See, e.g.*, *United
States v. Baer*, 235 F.3d 561, 564 (10th Cir. 2000) (holding that the felon-in-
possession statute does not violate the Second Amendment "absent evidence that
[the firearms in question] in any way affect the maintenance of a well regulated
militia"); *see generally* David B. Kopel, *The Second Amendment in the Tenth
Circuit: Three Decades of (Mostly) Harmless Error*, 86 Denv. U. L. Rev. 901
(2009).  The *Heller* dictum, however, affirms the ultimate disposition—i.e., that
the Second Amendment does not protect a felon's right to possess firearms.

discrimination that need only survive rational basis review. The question may be less clear, however, where the underlying felony is non-violent, such as financial fraud, perjury, or misleading federal investigators. But § 922(g)(1) encompasses these (and other) non-violent felons as well, permanently restricting their Second Amendment right to self-defense.

This brings me to my second point. The Court's summary treatment of felon dispossession in dictum forecloses the possibility of a more sophisticated interpretation of § 922(g)(1)'s scope. Applying *Heller*'s individual right holding to various regulations would be complicated, and it is of course possible (if not probable) that different courts would articulate different standards. Already a number of commentators have considered and proposed approaches to the existing gun laws and the proper level of constitutional scrutiny. *See, e.g.*, Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443 (2009); Marshall, *supra*, at 728–31; Larson, *supra*, at 1379–1382. But the existence of on-point dicta regarding various regulations short-circuits at least some of the analysis and refinement that would otherwise take place in the lower courts. In this case, for example, we need not address the standard of review applicable to gun dispossession laws—strict scrutiny, intermediate, rational basis, or something

else—or the examination of the governmental interests in light of the standard of review.[3]

Rather than seriously wrestling with how to apply this new Second Amendment rule, therefore, courts will continue to simply reference the applicable *Heller* dictum and move on.  And in light of the Supreme Court's clear direction, this is perhaps how it should be.  After all, "our job as a federal appellate court is to follow the Supreme Court's directions, not pick and choose among them as if ordering from a menu." *Surefoot LC*, 531 F.3d at 1243.  I nevertheless wonder whether Second Amendment law would have been better served if the regulations *Heller* addressed in dicta had been left to later cases.

---

[3] By my count, at least six other circuits have rejected post-*Heller* challenges to the 18 U.S.C. § 922(g)(1) felon dispossession statute.  Almost all these decisions cursorily cite the *Heller* dictum, and almost all are unpublished. *See, e.g.*, *United States v. Anderson*, 559 F.3d 348, 352 n.6 (5th Cir. 2009)*; United States v. Brye*, 318 F. App'x 878, 879 (11th Cir. 2009) (unpublished); *United States v. Frazier*, 314 F. App'x 801, 807 (6th Cir. 2008) (unpublished); *United States v. Brunson*, 292 F. App'x 259, 261  (4th Cir. 2008) (unpublished); *United States v. Gilbert*, 286 F. App'x 383, 386 (9th Cir. 2008) (unpublished); *United States v. Irish*, 285 F. App'x 326, 327 (8th Cir. 2008) (unpublished).